And for appellant, we have Mr. Bright and Mr. Serra, or Mr. Bright. Good morning, Your Honor. I'm Mr. Serra. Mr. Serra. All right. And for appellee, we have Mr. Stone. Yes, good morning, Your Honor. Good morning to both of you. Thanks for coming here to illuminate us. This case is set for 20 minutes argument per side. And please proceed. If you would like to make rebuttal argument, please stop short of using up to 20 minutes. Thank you and good morning, Your Honors. My name is Solomon Serra. I am the counsel for the appellant, Eminence Capital, who is the designated lead plaintiff in the district court in this securities class action. I want to talk initially about the procedural history of this matter because I think it's highly germane. This is the second time we have been before the Ninth Circuit in this case. And the first time led to an opinion, which was published at 316 Fed Third, granting Eminence Capital leave to amend its complaint. Now, in the context of that first appeal, we were dealing with an order signed by the district judge on September 10th, 2001. That order in the five or six year history of this case is the only substantive written order that has ever been delivered by the district court analyzing in detail the allegations of the complaint. The prior appeal was taken from that order. Is that right? Yes, Your Honor. Okay. The order merges into our opinion and you go forward now with a clean slate back to comply with the opinion. Yes, Your Honor. And now a new judgment is entered and that's what we're dealing with here, not the prior judgment. That's correct, Your Honor. But the point I was going to make was that the district court in the September order actually indicated that in many respects our allegations at that time were sufficient. And in a few respects, they were deficient and she identified what those were. And when we presented argument to this court the first time around, we said in our appellate briefs, here's how we believe we can correct the deficiencies that the district court found. We will be able to make these additional allegations. And that led this court to make a finding in its appellate decision that it appears, and I quote, most importantly, quote, it appears that plaintiffs had a reasonable chance of successfully stating a claim if given another opportunity, end quote. And I think it's fair to say that that determination was based on the proffers and the arguments that were made in the appellate briefs. It's really not a finding of fact. It's a justification for remand. Absolutely, Your Honor. Now, whatever the earlier panel concluded based on argument made to it, that's not really before us. All we know is what they said. They thought there was a reasonable chance, so you're entitled to amend. Now there's an amendment, and then the district court makes a ruling, and I think we have to look at whether the complaint as amended satisfies the proving requirements of the DSLRA. Absolutely, Your Honor. I don't disagree with that. All right, Your Honor. When we went back after remand, we tendered a second amended complaint to the district court that incorporated specific allegations that had previously been omitted that directly answered the omissions that the court had previously identified in its September 2001 order. There were certain specific things that the judge said at that time that she was looking for in the way of temporal matters, dates, source information, and the like. We tendered that complaint, and the defendants went ahead and they submitted for the district court a redlined copy of that complaint. It's tab two to our appellant's excerpts of record. We did not object to that because we thought it was very illustrative of why the district court should, at that point in time, find the complaint to be sufficient. It contained the very detail that the district court had previously said we had not provided. Now there never was a substantive written order on the adequacy of those changes that we made. All that happened at that point in time is that we went before the district judge on the argument on the motion to dismiss the second amended complaint, and we had a hearing. And the judge started out the hearing by saying, essentially, and this is tab four to the appellee's excerpts, I think it's still deficient. I'm going to let you tell me what you want, but for all the reasons in the defendant's moving papers, I find the complaint is deficient. And there was nothing beyond that. There was nothing beyond that. There was no analysis whatsoever by the district court of the import of the things that we had added to the complaint, which were very substantive and very responsive directly to the district court's prior concerns. At that point in time, the district court engaged me in a discussion about, is there anything else that you feel you have to add at this point? And I reminded, and there was a colloquy with the district court at that time, about the fact that this company, in March of 2001, had issued an aid case saying, we had acknowledged there were accounting errors, there were accounting misstatements, and we are going to commence a special investigation by an independent committee of directors to get to the bottom of what happened. We had a discussion about that because that's obviously a very significant announcement. It's an acknowledgement, if you will, that there were serious problems. They were trying to discover what happened. What turned out was that investigative committee never issued any report, despite a public statement being made to the investing public that there was going to be an investigation analysis. Nothing ever came of that. And based on that announcement, the auditing firm for this company, Price Waterhouse, resigned and indicated that there were significant problems that they had uncovered. And we told the judge in the hearing that we have learned of a state court lawsuit between Aspion and its outside independent auditors, Price Waterhouse, where allegations were flying back and forth about the very audits and conduct and reviews of quarterly reports that were at issue in the securities litigation. Do I find all these matters in the second amended complaint? Some of them are, Your Honor, but most of what I'm talking about now are in the third amended complaint, which is what is at issue, obviously, before this court. Certainly the third amended complaint contains all the things that we added in the second amended complaint, which the district judge never directly addressed, but it also included what I am now discussing, which is information that we drew from the public files of a state court lawsuit between Aspion and Price Waterhouse. And those allegations and information were extremely significant, and they are recited in detail as relevant in our third amended complaint. And they include sworn deposition testimony of the Price Waterhouse auditors, effectively saying that Price Waterhouse was misled by the management of this company in the conduct of the audit, that the company failed to cooperate with Price Waterhouse in its effort to conduct reviews of the quarterly reports and the audits, that there was an abysmal failure to provide requested information repeatedly over a lengthy period of time, that the chief executive officer and the chief financial officer of Aspion were the most uncooperative, unhelpful, and hostile executives that Price Waterhouse had ever encountered. We also dug up from that litigation the new information that's included in the third amended complaint, which includes PowerPoint presentations that were made to high officials of Aspion, which included emails that are directly on point with regard to the improper revenue recognition allegations that we have alleged in our complaint. And what did the district court say about the third amended complaint? The district court said virtually nothing about the third amended complaint, your honor. There was a brief hearing in which she reiterated that she continued to find it deficient, and there was a short minute order of a few lines in length, which is attached to our appellate... It's not deficient for reasons stated by the opposition pleading, right? Well, your honor, I don't recall that with respect to that hearing. I recall it with respect to the hearing on the second amended complaint. It is possible that something similar was said on the third amended complaint. When you get to the bottom line in this case, my concern is Sander. You tell me what Sander is and where you plead it. Very well, your honor. I will do that because that is the one thing that the judge did identify in the minute order. She backed away from the conclusion that there were no false statements, and the issue was Sander. That is the state of mind, deliberate recklessness. Well, the information that we have on Sander, your honor, is the following, and I think this has to be considered. It's pleaded. It's pled, your honor. All of what I'm discussing is pled. I'm not making arguments. I'm reviewing for the court. Your honor, it would be very helpful to the court, I'm sure, if you go to your ER, take your complaint, tell us the specific paragraph you rely on for Sander. Very well, your honor. We have tried to... If it states it, if it doesn't, she's wrong. Right. And, your honor, we have tried to do that, and I think we did do it in great detail in our briefs, but I'll be happy to review that here because it is set forth. First of all, the deception of the auditor is laid out in great detail in our complaints in paragraphs 40 and 41. Second of all, the recognizing of service revenue up front, which violated the company's own revenue recognition policies in connection with the Allied Domet contract... Did you say deception of the auditor? You mean the company deceiving the auditor? Yes. Yes. And, your honor, the McKesson decision, I think common sense tells you that's highly probative of Sander. The auditor is there to act as the public watchdog, and the company knows they're going to be issuing publicly reviewed reports and are reviewing the quarterly reports. That's some of the strongest evidence I think you can possibly have on Sander. With respect to the revenue recognition, it's identified in paragraphs 5, 39, 40, and 113, where we have identified e-mails, also in paragraph 41, going back and forth from high officials of this company, internal e-mails which were disclosed in the course of the Price Waterhouse litigation, which talk about the fact that this company's revenue recognition policies are improper, that there had been discussions with Price Waterhouse regarding proper revenue recognition, that it had been documented that it was improper as of January of 2000, and that there's a whole track record in this complaint of detailed evidence, which we were fortunate to be able to get, because we had been permitted to proceed to a Third Amendment complaint. We told the judge we had it. We did have it, and we put it in. The allegations with respect to obsolete inventory, which were carried at full cost when they were known to be obsolete, are at paragraphs 78 and 79, Your Honor. These are reflective of numerous internal conversations regarding the fact that there was inventory that this company knew it could not use. These people were expert in this business. It was not a particularly large company. Their own disclosure said that the technology was constantly changing, and we have identified in the complaint the specifics on the obsolete inventory allegations, which the district judge initially said we didn't have. This is in paragraphs 79 and 81. We also have the allegations with respect to the miscount of inventory. There was $1.4 million out of $7 million worth of inventory that could not be accounted for. We recite in the complaint in paragraphs 79 and 81 the numerous conversations internally about what this could be done with this and the fact that the executive officers of this company absolutely refused to take down the necessary write-down at that time because it would reflect and require a hit to their earnings, which they were not prepared to accept. And this was a point of controversy again with Price Waterhouse. Paragraph 81 discusses the specific allegations that the CEO and CFO of this company appellees. Can I back you up for a moment? Yes, Your Honor. Is the idea that they overstated their inventory and didn't write off inventory that was missing? Yes, Your Honor. There's two aspects to that. That is one aspect of it, missing inventory and lack of control over inventory, and there's a second aspect to it, which is obsolete inventory. They're separate and they're both in the complaint, Your Honor. And the inventory discrepancy in the conversations among the appellees stack and hurts about ordering concealment of the discrepancy from the investing public is alleged in paragraph 81. Paragraphs 84, 85, and 86 talk about the failure to take increased warranty reserves because this company was using old and reclaimed parts and selling them as new and they were experiencing as a result of that extraordinarily high returns of their product. GAAP requires that when that occurs, you've got to increase your warranty reserves. Now, if you do that, it's going to reduce your net income. And the allegations in the paragraphs I've recited talk about that in great detail. A refusal to increase warranty reserves as demanded by the auditor, as required by GAAP, and the CEO and CFO not doing that. Improper purchase accounting is alleged in paragraphs 87 and 90. This has to do with an April 1999 Dynamics Technologies acquisition and the goodwill of that company. Goodwill being what you paid over the value of the net assets of the company that you acquired. That is required to be amortized over a period of years. But GAAP says you have to really determine what the useful life is of the technology and the goods that you've required and use that period to amortize the goodwill. The longer you take to amortize it, the less of a hit there is to your net income and earnings. This company... A company with all high-tech products would have their goodwill amortized, I assume,  Absolutely, Your Honor. Absolutely. That's the point. And this company chose a ten-year and applied a ten-year goodwill amortization period when we allege with specifics in the paragraphs that I've cited to the court that the proper period was no more than two years. And again, the district court in its orders had previously raised some concerns about this, about the details of this, how the CEO and CFO would have known about this amortization period. We've provided that detail in the paragraphs that I've cited because of, first of all, their intimate knowledge of this company. Again, it's a small company. It's not a huge conglomerate. It's a small company with a discrete, easily defined type of technology. These people are fully knowledgeable about the technology of this company and the companies that they acquired. And they were informed by other knowledgeable employees of this company, the director of technology and the controller, the director of purchasing, people who would have knowledge, are in a position to know and are quoted and cited in our complaint. They were informed fully, the CEO and CFO, the appellees here, were informed fully by these sources that are cited in our complaint that this amortization period was clearly improper and known to be improper. In paragraph 46, we have discussed a specific transaction regarding Champs Americana and RCS, and in paragraphs 48, which is wrongful for the reasons we set forth therein, and again, the scienter allegations are all in there, and paragraphs 48 and 51 talk about in detail the Pricewaterhouse uncovering the accounting violations while working on the fiscal year end 2000 audit, uncovering improper loans that were made to the CEO of this company that were never disclosed to the board, that were never disclosed until it was insisted upon by Pricewaterhouse that they be repaid and disclosed to the investing public. Again, clear evidence of the scienter, of the executive officers of this company. We have alleged that the CFO resigned in June of 2000 under pressure from Pricewaterhouse because of all of the improper accounting allegations that I've discussed here. And, Your Honors, that's a summary of what's in the complaint and the paragraph numbers. There's even more, I think, than I've given. We've tried in our briefs to be complete about this because, obviously, we recognize that this is going to turn on the allegations of the Third Amendment complaint. My point simply has been we gave the district court what she said she needed and more with the Pricewaterhouse allegations. This is sufficient under this court's precedence to survive a motion to dismiss, including under the recent Dau decision. And I'll reserve the rest of my time. Thank you, Your Honors. Thank you, Your Honor. Peter Stone on behalf of the appellees. Obviously, the primary issue before us this morning is whether scienter has been adequately pled. That is, whether they have pled sufficient specific facts to give rise to a strong inference of either intentional conduct or deliberate recklessness. It's a very high standard. I would suggest that as I go through my argument, that the most important principle to keep in mind is one that was set forth by this court in the Vantive opinion, which is that typically what you need to satisfy that standard in a revenue recognition or an accounting manipulation case are allegations of specific contemporaneous facts that the defendants understood that they were engaging in improper revenue recognition. Specific contemporaneous facts. A meeting that Pete Stone, the CFO, was in where someone told him he had to recognize this revenue next quarter, not this quarter. And I said, no, we're going to do it this quarter. That's the kind of information that you see in cases that have found the standard met. The Newco case comes to mind. That's the mind your own business case. I'm told I have to do something as a CFO. And I say, you know what, mind your own business. I'm going to take care of that how I want. There are none of those facts in this complaint. There are a lot of what you just saw from counsel in this complaint. Generalizations coupled with some specific facts that either are outside the class period, have nothing to do with the issue that they're talking about, or are not specific contemporaneous facts. How about the overstatement of inventory value? Let's go right to that particular one. And also address the amortization period for the goodwill of acquired companies. I will, Your Honor. The inventory write-down is a good example of what I was saying, where you have specific facts, but they don't satisfy the Vantive Principle. In that case, you have an allegation that the Vice President of Purchasing, who left the company, prior to the class period by several years, had a discussion with the CEO and the CFO that some of the inventory having to do with their original product was, in his view, obsolete. You then have a specific allegation that he discussed with his successor in June of 1999, again prior to the class period, whether that inventory was still around, and that person said yes. You then skip ahead to one more specific fact, which is a discussion that the first VP of Purchasing supposedly had with a unnamed executive from the UK, who came to Irvine headquarters sometimes, who told him that the inventory was still around and, quote, had not been properly accounted for. Now, in my mind, there are a couple of failings with those allegations, and that is, by the way, as specific as they get. Well, I mean, it is a complaint, and it's preliminary to even summary judgment, discovery and summary judgment proceedings. I guess the issue is, under the PSLRA and Silicon Graphics and our other precedent, how specific do you have to be? I think the answer is very specific, Your Honor. This is obviously a demanding area of the law. The Congress has spoken in this area twice in the last 10 or 11 years as to abuses that they've seen, and they've raised the bar fairly high, which this Court, in cases like Silicon Graphics, has recognized. They don't want abuses, but also they want the – I think they still have the securities laws on the books to protect the investing public if companies are engaging in manipulations of the books. Well, look at the inventory. Go back to the inventory issue, Your Honor. The problem with that issue is twofold, I think. One, you have a bare conclusion by some person from the U.K. that the accounting wasn't done properly. How does that person have the foggiest notion of whether the inventory was accounted for or not? And even if they did, bear in mind in this case, the overstatement of inventory is supposedly $400,000 on a company that has, in this three quarters that are at issue, $60 million in revenue, and the company has a million-dollar inventory reserve. So even if there was a $400,000 overstatement, you've got a million-dollar reserve to offset it. There's nothing that this unnamed U.K. executive says about any of that. I think that's first and foremost. Second of all, there isn't anything in those allegations that puts the individual defendants contemporaneously in the middle of this. And I guess I do have a third point, which is that why isn't this just a business judgment question? I mean, someone thinks it's obsolete. The CEO thinks it's not. Why is the inference that that's fraud? I think that's the question you could ask in most of these instances. The DTI acquisition, which you asked about, amortization question, is exactly the same thing, Your Honor. You have there, and getting into the specifics, you have an acquisition at about $14 million. The actual assets, physical assets of the company are a million dollars. So you have a $13 million of excess cost over the purchase price over what the assets are. You have to account for that. The way you account for that is by calling it goodwill. Then you have to amortize that over a period of time. You amortize that over the useful time and the period of the goodwill. There's a lot of stuff in the complaint about how the assets are fleeting and the shelf life. That's really kind of a bait and switch because the question is, how is the goodwill amortized, not how does it relate to the shelf life of the products? And they pick a 10-year period. The plaintiffs come in and say it should be three years. Why is that not just a disagreement about a business judgment? How is that fraud? Who is it that told the CFO who makes the decision on amortization, it has to be three years, and he said, mind your own business? But that's their theory of the case. Your theory might be it's a business judgment. Is that a pleading issue? It is. Or is that a substantive issue? It is a pleading issue. It's a pleading issue under the Gomper case, Your Honor, because the inferences from the complaint have to be drawn in all the directions they can be drawn, and then you, you know, under the America West case, take what, and I don't mean this pejoratively, kind of a gestalt view of the complaint and decide whether enough is enough. And here, their inferences on these facts, and these are, by the way, I think Your Honor probably knows, getting me to talk about these, these are the two best pieces that they have. They're inferences that absolutely go the other way. And then you take, in this case, the context of the restatement, the size of the restatement, which I'm going to get into now, and other facts, and those inferences directly contradict the notion of fraud. Here you have a very small restatement. Over three quarters, you have about a $675,000 restatement on revenues of $60 million. Those, what is the character of the restatement? You have a shifting of revenues from one quarter to another. So actually, the second quarter that's subject to the restatement, the revenues go up, not down, because you move some money to that quarter and away from a different quarter. Very small, and it's a shifting of revenues. It's not a case like McKesson, where you have $327 million restatement on revenue that should never have been recognized at all. Here you have very small shifting. So another salient fact related to the decision that Your Honor participated in, the Vantive. Neither the CEO nor the CFO sold a single share of stock. They're alleged to be, in the complaint, two of the largest shareholders of the company. They don't sell a single share during the class period. In fact, in the Form 4s that we submitted, you see that the CEO actually bought stock twice during the class period. Now, what kind of fraudster buys stock when he's inflating it? Isn't there an inference to be drawn from that? I think there are also inferences to be drawn in favor of the defense. When you look hard at the theory of the case,  and that there are internally contradictory allegations. When that happens, I don't think you can just accept all inferences in favor of the plaintiff in every instance. For example, there's an allegation that Price Waterhouse Coopers found the CFO to be an absentee CFO. At the same time, the plaintiffs are arguing in their brief that the CFO was such a detailed, hands-on person, you should presume scienter. I think in circumstances where you have their own complaint internally contradicting itself, there should be inferences drawn in favor of the defense. I think that's what the Gomper case stands for, Your Honor. I don't believe there's another Ninth Circuit case that I'd be speaking to. I also think that this case is a lot more like the Vantive case that I referenced than it is the cases that are otherwise referenced, like the McKesson case or the Oracle case. In the Oracle case, you have $900 million of insider sales. Here, you don't have a dollar. In the Oracle case, you have, I mean, it is after all Oracle, a computer company, saying we can punch a key and find out any information about our company at a keystroke. Here, the allegation is precisely opposite, that there isn't that kind of a system in place. Are there other specific transactions that you'd like me to address? Anyone on the panel? All right. I would just then like to make two more observations, and then I'll retire. The first is there are a number of emails that are in the complaint. They're relatively small in number. It's not so much that your honors or clerks couldn't parse them carefully. They have – there's two, I think, fundamental truths about the emails. The first is they're not surprising at all. When you consider a company that has significant operations, that you'd have people at a subsidiary saying, well, someone's schedules don't work, or, you know, we have an internal control issue here or there. What's, I think, noteworthy about these is that they're not specific at all, and they generally have with them a command by someone in management, fix this problem, correct this problem. They hire a consultant whose job it is to assist with the audit. So, you know, I think there are inferences to be drawn from that as well. There's also a fair amount of mudslinging in the complaint regarding the PricewaterhouseCoopers audit, and I think that tends to fall into two categories. First, there are some deposition remarks about the CEO and the CFO. Those remarks, I don't believe, lend any inference of Siender at all. Saying that the CEO presented obstacles to the audit without saying what the obstacles were, did this matter, and in circumstances where PWC eventually resigned without any disagreement with management, I don't think you could draw an inference of Siender from that, certainly far from the McKesson case. And second, you have a certain amount of just innocuous statements about how the audit went. We asked for schedules. They didn't give it to us on time. We tested 20 items. A couple of them didn't pan out. It's the kind of thing you would see in a mid-sized public company like Aspion was. For all these reasons, Your Honors, I believe that Siender is not established here. We've also made a backup argument about a lack of particularity, pointing out several issues of particularity as to the five or six transactions at issue, and if the Court were to conclude that Siender were somehow satisfied, we'd ask that it affirm on that basis. I don't believe the panel needs to get there to affirm the district court's rule. Thank you. Mr. Sarabia, your rebuttal. Your Honor, in rebuttal, I would just say I think counsel has really glossed over the detail in these two categories of allegations that we've talked about, inventory obsolescence, and with respect to the DTI goodwill write-off, which are at paragraphs 77, 79, and 87 through 90. What you heard is not reflective of what we have alleged. There is great detail. The sources are identified for these allegations. The reasons they would have to have knowledge and the communication of that knowledge to the CEO and the CFO are alleged in great detail. I invite the panel to review these allegations because they are not as described. It is, however, important to remember that one must consider the totality of the allegations here, and counsel tried to make a business judgment rule argument or a materiality argument. The materiality argument I don't think was ever presented before, but it's clearly wrong because this company was forced by Price Waterhouse to make restatements of previously issued financial statements, and that's why at the end of the day there was no disagreement with Price Waterhouse. Price Waterhouse had succeeded in forcing them to reveal accurate numbers to the investing public, and the fact of the matter is when you consider the restatements caused this company's publicly traded securities to go from $30 to zero, and when you consider the allegations with respect to the Price Waterhouse interventions, the lawsuit, these are not just casual statements as counsel referred to them. It's sworn deposition testimony in a lawsuit seeking substantial damages. That is the deposition testimony of Price Waterhouse personnel with respect to the lack of cooperation they were receiving. This is a restatement case. Bantam was not a restatement case. Bantam was a projections case. It was about the sales cycle of Bantam, a software company, and the type of products they were selling. This has no connection, no relationship to that. This is a publication of false financial statements which this auditor ultimately succeeded in requiring this company to correct. These are not general allegations in this complaint. These allegations are detailed. These e-mails are meaningful. All of the things that we have alleged are supported by evidentiary material that we were able to gain access to outside of the context of the securities litigation. When you look at the totality of these allegations, I don't think there can be but any conclusion that at least for pleading purposes, at least for an opportunity to try and, through discovery, support the allegations that we have made here which are greatly detailed on Sienter, this should be enough. It certainly is under this Court's most recent decision. We have the right allegations in here for Sienter. This is not just plaintiff's counsel saying that, you know, this was an appropriate goodwill amortization period. That's not correct. We haven't made these things up. We got them from sources inside the company with knowledge. So the suggestion that this is just, you know, disagreements about business practices and business judgments is totally fallacious. Okay. Thank you, Your Honor. I would just close by saying the case law from this Court indicates that it may be the situation where you have a securities law violation at the same time that you have a business judgment error. The two are not mutually exclusive. But if there ever was a case, I think, where one could reasonably conclude from the allegations that what you're really trying to do is a misstatement of publicly issued financial statements, restatements, investigations that should have happened that never happened, a company basically disappearing from the public's trading markets, lawsuits with its auditors. This is not about business judgment differences. This is about wrongful acts that the defendants knew were wrongful or were at minimum deliberately reckless in not realizing that they were wrongful. That's what this case is about. These allegations should be sufficient. Thank you, Your Honors. Thank you. We thank both counsel for the very strong arguments. The case of Eminence Capital v. Aspion shall be submitted now. Do you want to take a break or go on?
judges: Beezer, Gould, T. Nelson